**UNITED STATES, Appellee,**

v.

**Marvin T. MITCHELL, Defendant–Appellant.**

**Docket No. 02–1326.**

United States Court of Appeals, Second Circuit.

Argued: March 27, 2003.

Decided: May 12, 2003.

Jonathan S. Kolodner, Assistant U.S. Attorney (Diane Gujarti and Andrew J. Ceresney, Assistant U.S. Attorneys, of counsel) for James B. Comey, U.S. Attorney, Southern District of New York, for Appellee.

Yuanchung Lee, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: B.D. PARKER, RAGGI, Circuit Judges, GOLDBERG, Judge.[*]

B.D. PARKER, Jr., Circuit Judge.

Defendant-appellant Marvin T. Mitchell appeals from a judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge* ), following his conviction of (1) conspiracy to deal in firearms without a license and to transport into a coconspirator's state of residence firearms which have been obtained outside that state of residence, in violation of 18 U.S.C. § 371, and (2) the substantive offense of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1). On appeal, Mitchell argues principally that he could not have participated in a conspiracy to violate 18 U.S.C. § 922(a)(3) because he purchased the firearms at issue in his own state of residence. In addition, he challenges evidentiary and other rulings made during the course of his trial. We affirm.

## BACKGROUND

The proof at trial established that in early November 1999, Mitchell, an enlisted soldier in the U.S. Army posted at Fort Hood, Texas, took a Greyhound bus to Brooklyn, New York, where he met with a man he knew as "Lotto." They discussed a transaction in which Mitchell would buy guns in Texas—where handguns were cheap and easy to procure—and transport them to New York, where Lotto would pay for them.

Mitchell then visited several different pawn shops in the Killeen, Texas area and purchased approximately nine guns. At the time of each purchase, Mitchell provided identification, went through a criminal background check, and completed and signed an ATF Form 4473, a firearms transactions record. Each Form 4473 contained a description of an illegal firearms sale[1] and warned that it was illegal under 18 U.S.C. §§ 922 and 923 to engage in the business of dealing firearms without a license.

Mitchell drove to New York and delivered the guns to Lotto, who paid Mitchell $600. In addition, Lotto gave Mitchell an additional $2,300 to purchase more firearms in Texas. While at Lotto's house, Mitchell observed that Lotto had an AK–47 machine gun, a modified MAC–10 rifle, and other guns. Mitchell also noticed several pounds of marijuana and what appeared to him to be crack cocaine. Lotto asked Mitchell to bring marijuana and cocaine from Texas to New York because drugs were cheaper in Texas. Mitchell declined.

Mitchell returned to Texas later that month and again visited local pawn shops, purchasing additional firearms with the money he had received from Lotto, completing ATF Form 4473s at each shop.

---

[*] The Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

1. Form 4473 provided the following example: "Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. If Mr. Jones fills out this form, he will violate the law."

Mitchell then drove to New York and delivered the guns to Lotto. In mid-December, Mitchell brought between 14 and 16 guns—including a shotgun—to New York. Lotto was not able to purchase the guns, but Mitchell eventually sold the shotgun to a third party.

In January 2000, prompted by Killeen Police Department reports that Mitchell had been buying a large number of firearms, an agent of the Bureau of Alcohol, Tobacco & Firearms ("ATF") began an investigation. The agent traced the firearms and discovered that at least one of them had been recovered by the New York City Police Department in New York. By the time of Mitchell's trial in December 2001, nine of the firearms that Mitchell had bought had been recovered by law enforcement authorities in New York. The agent obtained a search warrant for Mitchell's residence and interviewed him at Fort Hood in June 2000. The interview was tape-recorded.

During the interview, Mitchell admitted to purchasing about 40 firearms, most of them on Lotto's behalf, selling many of these firearms to Lotto, and bringing them from Texas to New York for Lotto on several occasions. Mitchell also conceded that he knew that New York had strict gun laws, in part because he had been arrested in New York in 1991 for possessing a firearm (the charges were dismissed when the police discovered the firearm to be inoperative). In addition, Mitchell admitted that he knew that it was illegal to transport guns from Texas to New York for resale.

In a November 2001 indictment, Mitchell was charged with (1) conspiring, in violation of 18 U.S.C. § 371, to deal in firearms without a license and to transport firearms into a co-conspirator's state of residence which have been obtained outside that state of residence, in violation of 18 U.S.C. § 922(a)(3); (2) the substantive offense of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1); and (3) aiding and abetting another individual to receive firearms into that person's state of residence which have been obtained outside that state of residence, in violation of 18 U.S.C. § 922(a)(3).

At trial, the Government's evidence showed that he purchased guns in Texas, sometimes with Lotto's money, transported them to New York, and delivered them to Lotto. The evidence at trial included Mitchell's own testimony, a taped recording of the oral statement that Mitchell gave to the ATF agents, and the testimony of these agents, two of Mitchell's army sergeants, and shop owners who had sold guns to Mitchell.

Mitchell's principle defense was that he did not knowingly violate § 371 and 922(a)(1), citing his willingness to present his own military-issued identification while purchasing guns and his notification of Greyhound and the Killeen Police Department when, on one occasion, he lost three guns in transit by bus between Texas and New York. Mitchell was convicted of conspiracy to violate 18 U.S.C. § 922(a)(3) and the substantive offense of dealing in firearms without a license, in violation of § 922(a)(1). After giving Mitchell a four-level sentence enhancement pursuant to U.S.S.G. § 2K2.1(b)(5) for transferring guns he had reason to know would be used to commit felonies, the district court sentenced Mitchell to 37 months' imprisonment, three years' supervised release, and a mandatory $200 special assessment. Mitchell appealed.

## DISCUSSION

Under 18 U.S.C. § 922(a)(3), it is illegal

for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides ... any firearm purchased or otherwise obtained by such person outside that State ....

Mitchell contends that "[s]ection 922(a)(3) requires that the *purchaser* buy the guns outside of his state of residence, and then transport them into (or receive them in) *his* state of residence." (Br. of Defendant–Appellant at 31 (emphasis in original).) Given that Mitchell purchased the guns in Texas, his state of residence, he contends that he could not have conspired to violate 18 U.S.C. § 922(a)(3). The proper interpretation of a statute is a legal question that we review *de novo*. *See United States v. Pacheco*, 225 F.3d 148, 153 (2d Cir.2000).

"In determining the scope of the statute and the persons to whom it is applicable, we must consider not only the plain meaning of the language used in the statute, but also must interpret that language in light of the purposes Congress sought to serve by promulgating the relevant laws." *United States v. Matteo*, 718 F.2d 340, 341 (2d Cir.1983) (citing *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 116–17, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983); *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). As the Supreme Court noted in *Huddleston v. United States,*

When Congress enacted [18 U.S.C. § 921 *et seq.*,] it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest.... The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency."

415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) (quoting S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968), U.S.Code Cong. & Admin.News 1968, 4410).

■ Section 922(a)(3) applies to firearms "purchased or otherwise obtained" outside of an individual's state. By using the term "or otherwise obtained," Congress communicated its intent to have the statute's proscription reach beyond straightforward, one-on-one purchases to cover those illegal firearms transactions effected through the use of agents or straw men. Here, the proof established that Mitchell conspired with Lotto, a New York resident, to obtain guns for Lotto outside of Lotto's state of residence. Lotto gave Mitchell $2,300 to buy guns in Texas; Mitchell bought the guns and transported them to Lotto in New York. In this manner, Lotto, while not the direct purchaser of the weapons, "otherwise obtained" them, and Mitchell conspired with Lotto to violate § 922(a)(3) by serving as his agent. In reaching this conclusion, we join the First Circuit in characterizing the employment of out-of-state agents to purchase firearms as "otherwise obtain[ing]" such firearms pursuant to § 922(a)(3). *See, e.g., United States v. Phillips*, 952 F.2d 591, 593–94 (1st Cir.1991) (defendant guilty under section 922(a)(3) where he wired money to Georgia resident to buy guns in Georgia). Accordingly, the defendant's conviction for conspiracy to violate this statute was proper.

■ Next, Mitchell contends that the district court's jury instruction failed accurately to describe the federal offense proscribed by 18 U.S.C. § 922(a)(3), leaving the jury with the impression that it could convict Mitchell of conspiracy to violate

this statute if it merely determined that he had conspired to transport firearms across state lines without a license, despite § 922(a)(3)'s additional requirement that an individual obtain firearms from outside his state of residence. In support of this argument, Mitchell cites several excerpts of the jury instructions where he claims the court misstated the elements of § 922(a)(3):

> Count One charges the defendant with conspiring ... without a license to transport interstate or to receive firearms that have been shipped interstate into the state of residence of the transporter or the receiver....
>
> The second object he is alleged to have agreed to accomplish is to, without a license, transport interstate or receive firearms that have been shipped interstate into the state of residence of the transporter or the receiver....
>
> The second [object of the conspiracy] is that he transported interstate or received firearms that had been shipped interstate into the state of residence of the transporter or the receiver....
>
> [A]ll of you must agree that the defendant transported or received firearms interstate in a state of residence of a coconspirator from another state.

(Br. of Defendant–Appellant at 38–39 (quoting Tr. at 465, 472, 473, 474).) Mitchell, however, did not object to these instructions and now faces the heavy burden of demonstrating "plain error." *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

"We review a jury charge in its entirety and not on the basis of excerpts taken out of context." *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir.1998) (internal quotation marks and citation omitted). When read as a whole, the instructions in this case adequately describe the allegedly missing element of 18 U.S.C. § 922(a)(3):

either the defendant transported firearms across state lines into the state of residence of a coconspirator who received them, or the defendant received firearms that were transported into his state of residence.

In any case, a trial court's failure to instruct the jury on an element of the offense may be harmless if the evidence in the record could not rationally lead to a finding favoring the defendant on an omitted element. *See Neder v. United States*, 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Here, there was overwhelming evidence—and it was never disputed—that Mitchell purchased firearms in Texas, transported them to New York, and delivered them to Lotto, whose state of residence was New York. Thus, any ambiguity in the district court's instructions regarding this element would have been harmless.

Mitchell also challenges the introduction of evidence of a 1991 arrest for the possession of a firearm. Evidence of prior bad acts may be introduced to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Under our Circuit's "inclusionary approach," other acts evidence can be admitted "for any purpose other than to show a defendant's criminal propensity." *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir.2002) (quoting *United States v. Pitre*, 960 F.2d 1112, 1118 (2d Cir.1992) (internal quotations omitted)). We review the admission of such evidence for abuse of discretion. *Garcia*, 291 F.3d at 136.

We see no abuse of discretion here. As previously noted, Mitchell's primary defense was that he was unaware that purchasing, transporting and selling quantities of firearms without a license was illegal. This claim of ignorance placed directly at

issue his credibility and whether he had reason to know of the illegality of his conduct, a factor relevant to whether the defendant acted willfully, *i.e.* "intentionally and purposely and with the intent to do something the law forbids" or, put another way, "with the bad purpose to disobey or disregard the law." *Bryan v. United States,* 524 U.S. 184, 190, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (internal quotation marks and citation omitted). In Mitchell's taped interview with the ATF agents, Mitchell conceded that he had "knowledge that the laws of New York are real strict about firearms" because of his prior arrest. (Tr. of Interview (Tape 2, Side A) at 1–2.) Evidence of the arrest was therefore relevant to whether Mitchell's knew that his conduct was illegal and, nevertheless, decided purposely to disobey or disregard the law. Under these circumstances, such evidence was not impermissibly prejudicial.

■■■■ Mitchell also argues that he should not have received a sentence enhancement pursuant to U.S.S.G. § 2K2.1(b)(5). Under U.S.S.G. § 2K2.1(b)(5), a four-level enhancement is appropriate where a defendant "transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Here, the district court found that "there was good reason to believe that these guns would be used in future crimes." (Sentencing Tr. at 23.) We review the district court's factual findings for clear error. *United States v. Dodge,* 61 F.3d 142, 146 (2d Cir.1995).

In *United States v. Martin,* 78 F.3d 808, 812–13 (2d Cir.1996), we held that a four-level sentence enhancement was appropriate under this guideline where a defendant who sold firearms could foresee future felonies by the purchaser. In particular, we found that the defendant, who sold more than 100 "low-grade, easily concealable, inexpensive semi-automatic pistols," *id.* at 810, had reason to believe that the guns he sold would be resold on the street and "be used to commit other felonies," *id.* at 812. Moreover, our circuit has long recognized the connection between drug trafficking and firearms, repeatedly permitting firearms into evidence as proof of narcotics conspiracies "because drug dealers commonly keep firearms on their premises as tools of the trade." *United States v. Becerra,* 97 F.3d 669, 671–72 (2d Cir.1996) (internal quotation marks and citation omitted).

Here, Mitchell knew that Lotto was a drug dealer who owned guns and regularly carried guns himself. Mitchell also knew that the guns he obtained for Lotto were numerous, cheap, and included many small, easily-concealed handguns. These facts were an acceptable predicate for the trial court's conclusion that Mitchell had reason to believe, as did the *Martin* defendant, that the guns would be used in future felonies. Thus, the four-level sentence enhancement was proper.

■■■ Finally, Mitchell contends that the Government improperly referred to his nickname, "Phox," during trial, asking Mitchell whether "a fox is an animal that is considered sly" and noting in summation that Mitchell had "outfox[ed]" questions while testifying. As the Seventh Circuit stated in *United States v. Williams,* the Government "may introduce evidence of a defendant's alias or nickname if this evidence aids in the identification of the defendant or in some other way directly relates to the proof of the acts charged in the indictment." 739 F.2d 297, 299 (7th Cir.1984); *see also United States v. Burton,* 525 F.2d 17, 19 (2d Cir.1975) (where defendant's identity was at issue, Government's repeated reference to a defendant

by his alias, "Big Time," was "not to be encouraged" but also was not overly prejudicial). Mitchell's identity, however, was not at issue in this case, nor did the admission of the nickname directly relate to the proof of the acts alleged. Accordingly, the Government's references were arguably inappropriate. Nevertheless, references to Mitchell's nickname were not prejudicial in view of the fact that they were brief and isolated and in light of the substantial evidence of guilt adduced by the government. *See United States v. Shareef,* 190 F.3d 71, 79 (2d Cir.1999).

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.